OPINION OF THE COURT
Anthony J. Sciolino, J.
The court having previously made a finding of neglect *804 against respondent mother, Deborah M. (mother), pursuant to Family Court Act § 1012 (f) (i) (B), now turns to the task of fashioning an appropriate order of disposition pursuant to Family Court Act §§ 1052 and 1055. Mother agrees to most of the agency’s proposed dispositional plan, including continued placement of her daughter, Adrienne M., aged 8, in foster care, but mother objects to the agency’s plan to re-place Adrienne in a particular foster home.
During the pendency of this proceeding, Adrienne has resided in the foster home of Dean and Donna C. in Kendall, New York. As the C. foster home is no longer available, the agency must select another one for Adrienne. The agency seeks to re-place her in a foster home in which she previously resided.
Prior to the dispositional hearing in this case, the agency made a motion for summary judgment that the court was without authority to interfere with the agency’s selection of a foster home. The court denied the motion. During the dispositional hearing, the agency again raised the issue, asking the court to reconsider its position.
The court rendered a decision from the Bench reiterating its earlier ruling and barring the agency from re-placing the child in the intended foster home. Because of the novelty of the issue presented, the paucity of legal authority on point, the possibility of an appeal, and the likelihood that the issue will arise in the future, the court stated that it would render a written decision.
The court takes judicial notice of all prior proceedings involving mother and child, including Adrienne’s voluntary placement in foster care (docket No. K-164-87).
Facts
Mother is a 34-year-old divorced, single parent, whose only child, Adrienne (date of birth Apr. 2, 1983), is the subject of this proceeding. Adrienne was voluntarily placed in August 1986 in the certified foster home of Valencia and Thomas Y. in Hamlin, New York, where Adrienne had been placed informally by mother on at least two prior occasions. In 1984, at the suggestion of mutual friends, mother initially placed Adrienne with Mr. and Mrs. Y. when the child was only nine months old. Mother at that time was suffering from depression. Mother has a history of drug- and alcohol-related prob *805 lems, as well as numerous hospitalizations for psychiatric illness. The agency has been active with mother since 1984.
Unhappily, over the years, the relationship between mother and the Y.s has deteriorated to the point where during the court placement of Adrienne with them, documented in file K-164-87, mother, rightly or wrongly, concluded that the Y.s were attempting to subvert the permanency plan of Adrienne’s return to mother.
A DePaul Mental Health Clinic psychiatric evaluation of Adrienne at age 5 dated December 9, 1988, contained the following excerpts:
"John Seebach (caseworker) indicates that problems with respect to returning Adrienne to mother include child being trapped between loyalties to mother and foster parents and a reported resistance to visit at mother’s home * * *
"Mother fears * * * a custody battle for Adrienne with the Y.s and mother feels Adrienne is afraid of saying that she would like to visit for fear of punishment * * *
"Mother feels her attempts to regain custody of Adrienne have been thwarted by unfair statements of the Y.s.
"Ms. Kelger (caseworker) relates that the Y.s seem 'overly protective’ (of Adrienne).”
The DePaul evaluation concluded with: "Adrienne appears to be bonded to both the Y.s and mother and she likely is finding herself caught in the position of feeling that she has to make a choice between them. The difficulties that she has shown with nightmares in the past, as well as some of her reluctance to go on visits * * * may be a result of this conflict of loyalties.”
Adrienne’s current therapist, Joan Frank, M.S.W., from Crestwood Children’s Center, testified that although she did not review the DePaul evaluation, she believed that mother would be less likely to cooperate with the agency’s permanency plan if Adrienne were placed again with the Y.s. She opined that if Adrienne were placed in an environment where her loyalties were conflicted, she would likely suffer increased anxiety. She noted that Adrienne already feels such anxiety and added that if Adrienne were placed with the Y.s, with whom she is clearly bonded, and they did not encourage visitation with mother, this would present a significant problem for Adrienne.
Current foster mother, Donna C., testified that Adrienne presently has a good attitude toward twice-weekly visits with *806 mother. She noted that Adrienne’s behavior has improved considerably, her grades in school are better, and that she has made more friends recently. Ms. C. noted that from the beginning of placement, Adrienne has expressed her preference to live with the Y.s.
Case progress notes of caseworker Dorothy Kegler dated August 16, 1988 read in pertinent part: "The Y.s are very caring and loving relative to Adrienne. However, they have undermined DSS case planning by frequently calling (Agency) Deputy Director Diane Larter, Supervisor Sue Davie, and John Seebach to complain that protective worker Daisy Banks and this CW (caseworker) do not have Adrienne’s best interests at heart. The Y.s are dissatisfied with overnight visits and weekly phone calls and have taken it upon themselves to not follow through occasionally. The Y.s are having much difficulty accepting that there is a strong possibility that Adrienne will be returned to her mother Debbie within the near future, as Debbie has complied with the existing service plan.”
Ms. Kegler testified that Ms. Y. indicated that a previous caseworker had informed her that Adrienne would be freed for adoption and that Ms. Y. was upset that it was taking so long. Ms. Kegler testified that court-ordered visits while Adrienne was residing with the Y.s were frequently problematic, as was telephone communication between Adrienne and mother and grandparents. Moreover, on one occasion, Ms. Y. appealed directly to the District Attorney when her sex abuse referral against mother was determined to be unfounded by the agency, and on another, telephoned the Albany CPS hotline rather than deal with local agency personnel on a perceived problem with visitation.
Shortly after Adrienne was returned to mother in July of 1989 by Judge Leonard E. Maas of this court, the Y.s asked to be decertified as foster parents. The Y.s have only recently been recertified as foster parents and only when being advised by the agency that there was a possibility that Adrienne would again be placed in their home.
Mother testified that she did not want Adrienne re-placed with the Y.s because, in her judgment, such a placement would undermine the likelihood that Adrienne would be returned to her. The court notes that mother requested a change in foster homes when the voluntary placement case was pending. Mother stated that Adrienne is torn between her and the Y.s and is confused about who her real mother is. She *807 expressed concern that the problems experienced in the past would resurface if Adrienne were again placed with them.
Former foster mother, Ms. Y., testified that her relationship with mother has been strained, since at least February of 1990; that although at one time the relationship was cordial, it has been nonexistent since that time. Ms. Y. admitted that she did not agree with the permanency goal of return to mother when Adrienne was last placed in her home; that in her judgment Adrienne should not have been returned to mother in 1989. Clearly, Ms. Y. loves Adrienne and had difficulty detaching from her in 1989.
Conclusions of Law
The Legislature has determined that it is generally desirable for a child "to remain with or be returned to the natural parent because the child’s need for normal family life would usually best be met in the natural home” (Social Services Law § 384-b [1] [a] [ii]). The State’s first obligation is "to help the family with services to prevent its break-up or to reunite it” (Social Services Law § 384-b [1] [a] [iii] [emphasis added]). Once a child is placed in the custody of an authorized agency pursuant to a neglect proceeding, the agency is obligated to make "diligent efforts to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child” (Social Services Law § 384-b [7] [a]).
According to the Practice Commentary by Douglas J. Besharov: "As a general rule, the terms and conditions of placement are determined by the relevant child welfare agency, with limited court involvement. Parents have no explicit legal right to intervene or even to be heard on the subject. In Matter of Yolanda S., 148 Misc.2d 803 [Monroe County Fam Ct 1990] the respondent mother consented to an extension of placement but she vigorously objected to the particular foster home in which one of her two children would continue to live. [Judge M. Miller] held that, because the mother consented to the extension of placement, she had 'no standing to interfere with the (agency’s) discretion and authority in this regard.’ ” Besharov continues: "However, parents can sometimes be the source of important information about the child’s placement, including information about the psychological interaction between the child and the foster parent, about the care and supervision the child is receiving, and, in the extreme, about *808 possible abuse. And, of course, they are still the child’s 'parents’ and will likely regain custody. Hence, the better practice is to be receptive to parental comments about the child’s care and, upon a sufficient showing, to hold a hearing on the subject. Doing so is not a matter of parental rights but, rather, of judicial wisdom. ” (Besharov, 1991 Supp Practice Commentary, McKinney’s Cons Laws of NY, Book 29A, 1992 Cum Ann Pocket Part, Family Ct Act § 1055, at 166 [emphasis added].)
The Court of Appeals in People ex rel. Ninesling v Nassau County Dept. of Social Servs. (46 NY2d 382 [1978]) defined the intended nature and function of foster care. The court said (supra, at 387-389): "The foster parent-child relationship is a temporary relationship intended to provide the child with the benefits of a family setting, as an alternative to institutionalized care * * * Reluctance on the part of foster parents to deliver children placed in their care * * * seriously jeopardizes their continued utilization of the foster care program * * * '[F]aster care custodians must deliver on demand * * * or the usefulness of foster care assignments is destroyed. To the ordinary fears in placing a child in foster care should not be added the concern that the better the foster care custodians, the greater the risk they will assert, out of love and affection grown too deep, an inchoate right to adopt. The temporary parent substitute must keep his proper distance at all costs to himself.’ ”
Before the court can meaningfully enter an order of disposition, it must satisfy itself that the agency’s permanency plan is consistent with its statutory obligation to reunite parent and child. If the court does not have the authority to do so, as the agency argues, there would in effect be no review of an important component of the permanency plan; and if the plan is unlikely to achieve the stated goal of reunification, the best interests of the child surely will not be served. The court would then not become involved again in a significant way with the case unless a permanent neglect proceeding were filed. At that time the court would be obligated under law to review the adequacy of the agency’s efforts to reunite the family by measuring the agency’s conduct against the diligent efforts standard set forth in Social Services Law § 384-b (7) (a), which efforts would be found wanting. This, of course, would occur only after additional valuable time has elapsed without permanency in the child’s life.
The law provides that the court in its discretion may direct that the agency have a child reside in a specific certified foster *809 home where the court determines that such placement is a furtherance of the child’s best interest. (See, Family Ct Act § 1017 [2] [b].) A fortiori, the court may direct that a child may not be placed in a specific certified foster home if the opposite result were likely to occur.
The court reiterates its earlier ruling denying the agency’s motion for summary judgment. The court can and must inquire into the issue of whether re-placement of Adrienne in a particular foster home would likely undermine the stated permanency goal of return to mother.
After reviewing all the evidence herein, the court concludes that placement of Adrienne with the Y.s would not further the likelihood of success of the permanency plan, and would not further her best interests. Accordingly, the court directs that the agency not place the child in that foster home.