OPINION OF THE COURT
Herbert B. Ray, J.
The matter comes before the court in connection with petition by Broome County Social Services Department for extension of placement pursuant to section 1055 of the Family Court Act.
The parties all stipulated to the extension of custody of the *359 child, Eric, with the petitioner until November 7, 1992 and upon stipulation of respondent Sally, petitioner Social Services Department and Law Guardian custody of the child Christopher was extended with the petitioner Social Services Department until the same date.
There remains for disposition the petition for extension of custody as it involves the child Elizabeth born December 13, 1984.
The procedural history of this matter indicates that all the aforesaid children were placed in foster care on February 19, 1988 after the death of their half brother, Michael. Sally and Michael, Sr. admitted in Family Court on November 7, 1988 the following, among other admissions: "On or about the night of February 18, 1988, a child, Michael Jr., was brought to Wilson Hospital, Johnson City, NY and was dead on arrival. The four year old Michael had several bruises, cuts, marks and physical injuries on his body and a black eye and cigarette burns on his hands; Michael’s injuries were allowed to be inflicted by the respondents by non-accidental means causing or creating a substantial risk of death, or serious or protracted disfigurement or protracted loss or impairment of the function of a bodily organ of Michael, or allowed to be created by substantial risk of such physical injury to Michael”.
The children were adjudicated on the aforesaid date to be abused children and placed in the custody of petitioner Department of Social Services for 12 months. On September 6, 1989, the respondent mother, Sally, pleaded guilty to criminally negligent homicide, a class E felony, in criminal court and was sentenced to a term of one year in the Broome County Jail. Thereafter extensions of custody were granted to the Department.
Subsequent to the filing of this petition for extension of custody now before the court the Department placed the child with the mother.
The Law Guardian indicated that this case was one of the most frustrating he had handled in his career. The Law Guardian stated his frustration was initially caused by the Department’s witnesses/social workers as having "glossed over the death of this child * * * 'she’s okay now. We’ve decided the child should go to the mother’ * * * but I just got the impression that they just glossed over that.” He indicated that he was further frustrated in that the Department of Social Services "has pretty much predestined what I think I *360 have to do in this case.” The Law Guardian said he did not think it would be in the child’s best interest to be uprooted again.
The court acknowledges the depth of the tragedy that has engulfed the child resulting in her foster care for more than one half her lifetime as a result of her mother’s actions and that removal from placement in her mother’s care at this time would create yet another undeserved trauma to the child. The issue before the court however is whether the best interests of the child are served by avoiding such trauma to the child at this time by such a course predestined by the actions of the several social workers of the Department who placed the child with the mother during the pendency of the extension petition before the completion of the deliberative process and the final decision of the court on the issue of best interests of the child.
The decision to hasten the placement of the child Elizabeth with the mother during the course of the proceedings was curious since it was originally the Department’s plan to place the child with the father in August 1990. The decision was changed after a motor vehicle incident reported to social services workers by the mother, disputed by the father.
Gene Peters, a social worker for the Family and Children’s Society of Broome County, has counseled continuously with the mother from before the death incident to the present except for the period of her incarceration. She has told the therapist numerous contradictory versions of the story of the death of Michael including how she and Michael, Sr. manufactured a story for the authorities. Among the versions that she now claims to have lied about was that Michael, Sr. was not there that night. Her position in therapy thereafter was that she doesn’t know how the child died.
The court notes the following colloquy between the Broome County Court Judge and the mother on September 6, 1989.
"the court: Now, the count to which you offer a plea of guilty charges you with criminally negligent homicide, which is a class E felony. It alleges that on the 18th day of February, 1988, with criminal negligence, you did cause the death of Michael, Jr. and specifically it alleges that on that particular date, by physically binding the boy’s hands and/or his mouth in such a way as to cause the boy to asphyxiate is how you caused his death. Those are the facts that the District Attorney would have to prove before a jury could convict you and he would have to prove those beyond a reasonable doubt.
*361 "If you plead guilty today, you are admitting those facts to me. Do you admit those facts today?
"the defendant: Yes, I do.
"the court: So, you did bind the boy’s hands and his mouth in such a way as, as far as you know, caused his death by asphyxiation, is that correct?
"the defendant: Yes.”
The therapist, Peters, said that the way the mother has run her life is "she’s pretended to be something she’s not” and that a prime aim of counseling of the mother was that she accept responsibility. The counselor further stated: "That Sally be able to take at least fifty per cent of the blame. That this is essential if we’re going to see her as being safe in the future, that’s the number one step. You’ve got to take responsibility for what you did. If you keep saying T didn’t do it. Well, maybe I did it but it was really somebody else’s fault because they pushed me to do it’, then a person saying those things isn’t safe and you can never trust.” (Emphasis supplied.)
It appears that initially in counseling the mother attributed the death occurrence 90% to the elder Michael, to "I was participating in mental and physical abuse that was endangering his life * * * I was scared. I was troubled. I was unhappy and I did nothing to save Mike’s life.”
The therapist indicated that he didn’t know if there was a better alternative to placement with the mother and acknowledged that "There is a safety question now * * * This is certainly the kind of case that makes me worry. ” (Emphasis supplied.)
The caseworker indicated that if the child is with the mother that long-term monitoring of her performance and household is absolutely necessary and "if you can’t [adequately] monitor it then don’t take the risk.”
Dr. Richard Normile, a clinical psychologist of Broome County Mental Health Services, testified concerning involvement with both parents.
Dr. Normile saw the father in 1986 on three occasions in connection with an anger control problem which apparently improved. He also was examined pursuant to this court’s order in April 1989. The psychologist found need for external supervision and direction.
Dr. Normile saw the mother in January 1990 pursuant to this court’s order and previously participated in supervising *362 her examination in 1989 with a psychology trainee. The mother admitted to the examiner that she bound the hands and mouth of the deceased child which resulted in the child drowning in his own vomit. Although she made those admissions to the examiner, she stated that she did not know for sure how the boy died. Subsequently she attributed the child’s demise to Michael, Sr., who she was angry with because he had suffered no legal consequences as she had. She acknowledged "not protecting the boy from this abuse.”
The psychologist stated that "based upon her track record [the death of Michael] she had demonstrated some poor judgment.” From cross-examination by the father’s counsel, it is clear that the psychologist accepted the premise in his evaluation that the mother made the admission in court "to cop a plea” and that if she bound the hands and mouth of the child with "Duck tape”, "that’s more than poor judgment.”
In fact it appears the psychologist actively sought not to know the gruesome details, but it is difficult to assess the worth of the witnesses’ conclusions without the resolution of such a central issue. Acceptance of responsibility in the death scenario so important in evaluation by Counselor Gene Peters seemed not to play any significant role in evaluation by this witness. The difference between criminally negligent homicide or worse versus poor judgment does seem of significance to the court in evaluation of the mother and acknowledgment of her responsibility.
Dr. Nathan Hare, a clinical psychologist, testified that in spring 1991 he examined the mother. The examination consisted of a clinical interview, mental status exam and a span of psychological tests.
The mother told the examiner that under duress she had "done acts inappropriate to the care of the child.” She further told him that Michael, Sr. would hit her and get her to hit the child. She did not indicate to the examiner that on the night of the death of the child she had done anything affirmatively to the child. She stated that the man with whom she lived coerced her to bind the child up.
Among the written material received by the examiner were statements by the child Eric concerning how the mother would wrap up the deceased child’s arms and legs, pin the bandage so he couldn’t get out, put tape over his mouth, and the night he died poured cough syrup down his throat and tied him up among other horrendous acts.
*363 In connection with the MMPI test, personality inventory test, Dr. Hare indicated that the mother’s responses indicated a profile of persons who are generally denying problem areas, lacking insight into themselves and in their behavior, possibly rigid and inflexible, impulse control and judgment problems, ongoing problems with authority figures, rebelliousness. On the Rorschach ink blot test, the witness stated that the results were defensive and superficial and did not reveal much about the patient. On the I.Q. test the mother scored an 87 which falls in the low end of average range of intelligence.
The psychologist felt that the mother had not been open with him in comparing the statements of the mother to him and the reports that had been made available to him of events that he felt that "there was some minimization of them.” He stated that the minimization could possibly involve the death of the child.
In response to a direct question from the Law Guardian, Dr. Hare indicated that at the time of the examination, about one year ago, he would not be comfortable having one of his loved ones living with this woman because of her long history of impulse control problems, that she did not appreciate the enormity of the behavioral problems that Eric was experiencing, and also seemed to lack an understanding of her present husband’s lack of involvement with the children at the same time speaking of how they wanted the reformation of the family.
Dr. Hare stated that the mother was capable of manipulation in trying to present a positive image. He stated that it was "extremely” and critically important that the mother accept accountability for her actions in the death of the child and that the mother had not sufficiently accepted accountability for her actions.
Joann Zehr of Northern Tier Youth Services testified that initially it was felt that the father would be a better caretaker of the child but thereafter changed her mind and felt that the mother had more nurturing qualities.
Margaret Jeannette, a caseworker for Northern Tier, also testified to the same effect.
Milton, the husband of respondent mother, also testified on behalf of the mother’s position.
Raney Colvill, Broome County Social Services caseworker, explained the efforts and aims of the Department in their actions in the case.
*364 The father, Shaun, testified how Social Services changed its plans for placement with him after the respondent mother reported incorrectly a motor vehicle incident between them. The father did not object to extension, but strongly objected to placement with the mother.
The following colloquy at trial occurred between the Department’s counsel and respondent mother:
"question: Just looking at yourself and hearing what Mr. Peters testimony was and your counseling with him all these years do you see things about your personality that back shortly after the time the children stopped living with you, do you see your personality then as presenting some danger in resistance on the part of small children, for instance Elizabeth, looking at that time? — Do you see that as a problem in your relationship with small children?
"answer: Back before all this happened do I think I had a problem?
"question: Do you think looking back you had a problem? "answer: No I don’t. I never felt overwhelmed by my children.”
When asked if she felt any lack of insight back at that time represented a danger to her daughter, she indicated again in the negative. She explained that there was a difference in her lack of control with Michael (the dead child) which did not exist with her own children. She explained that by reason of her "maternal feelings” for her own children and "he was a hard child. He was not my own child.”
The Department’s counsel asked the respondent mother why she had refused to sit down with him as requested through the Department’s caseworker, Raney Colvill, to prepare her testimony for this trial which involved the children living with the mother. The mother replied: "Well you called me a murderer here in Court to my face. You called it on more than one occasion and I felt that I was owed an apology. You went on about it and said 'she’s a murderer’ and 'who will she murder next?’ I really felt quite bad about that and I felt you owed me an apology.” The mother, though unrepresented by an attorney, acknowledged that she was refusing to meet with the lawyer who was advocating the best interest of the child, to be with her, the mother, which was the same exact position she was advocating for the child. The following colloquy then occurred between the Department’s counsel and respondent mother.
*365 "question: Does that strike you as rigid at all?
"answer: Given the way you spoke to me, Mr. Oakes, no.” The mother stated that she did not tell the truth in County Court when she pleaded guilty in connection with the death of Michael but that she was telling the truth in Family Court in this proceeding.
This court had the ability to examine the demeanor and manner of testimony of the respondent mother. The court found the mother not credible. The court also found the mother reflected rigidity, inflexibility, lacking in insight, denying obvious problems and, most importantly, that she did not accept responsibility for her actions.
The court found as highly credible the testimony of Dr. Peters and Dr. Hare. If one gives any credibility to their scholarly presentations and warnings, the court feels that this child, Elizabeth, has been placed at high risk by Department caseworkers in placing the child in mother’s home.
The court is also concerned that the child, Christopher, who is in the home of the mother, is inappropriately placed and that the acceptance of the stipulation of the Social Services Department and the Law Guardian, by the value of the hindsight of this trial, should not have been accepted by the court. Since the Department maintains custody of Christopher, and also has had the benefit of the hindsight provided by the trial, the court which at this stage cannot change matters regarding Christopher, will rely on the Social Services Department to act appropriately.
Social Services Law § 384-b states in part:
"1. Statement of legislative findings and intent.
"(a) The legislature hereby finds that:
"(i) it is desirable for children to grow up with a normal family life in a permanent home and that such circumstance offers the best opportunity for children to develop and thrive;
"(ii) it is generally desirable for the child to remain with or be returned to the natural parent because the child’s need for a normal family life will usually best be met in the natural home, and that parents are entitled to bring up their own children unless the best interests of the child would be thereby endangered.”
This court finds that the child Elizabeth is endangered at this time in the home of her mother. The court also finds that the father has certain needs in connection with placement.
*366 If this court were merely to extend custody of the child, Elizabeth, after the above finding, knowing that Broome County Social Services Department intends to continue the child Elizabeth in the home of the mother, the court would be failing to fulfill its statutory obligation for the best interest of the child.
Family Court Act § 1017 (2) provides that the court in its discretion may direct that a child reside with a particular relative or in a particular foster home. A fortiori, the court may direct that a child not be placed in a specific certified foster home if the opposite result were likely to occur. (Matter of Adrienne M., 153 Misc 2d 803 [Fam Ct, Monroe County, Sciolino, J.].)
Certainly the court also has authority to formulate a plan that is in the best interest of the child and consistent with statutory dictates. Although the return of the child to the most appropriate parent is the ultimate goal, where the return is premature and not in the best interest of the child, the court has authority to direct the removal of the child from one of the parent’s homes. The court will make that direction and a finding that placement in the mother’s home at this time is not in the best interests of the child. The Social Services Department to whom custody will be extended may accordingly place the child in any other appropriate home consistent with the statutes.
The court will order services to be provided to both the mother and the father consistent with the best interest of the child.
The court will order the extension for a period of one year as it finds that the services necessary to be received by the parents require such a period of time for the parents to effectively benefit from them.
Accordingly, it is ordered that the petition for extension of placement of custody of Elizabeth is granted for a period of 12 months from the entry date of this order with the Commissioner of Social Services of Broome County; and it is further ordered that the Commissioner of Social Services of Broome County shall remove the child Elizabeth from placement in the home of Sally, though said respondent, shall be entitled to reasonable visitation with said mother as deemed appropriate by the Department; and it is further ordered that if the father, Shaun, does not receive placement of the child in his home by the Department, he shall have reasonable visitation *367 as deemed appropriate by the Department; and it is further ordered that each parent, father and mother, shall receive all services deemed appropriate by the Department to encourage and strengthen the parental relationship of each parent toward the objective of making each parent adequate to have custody of the child and correct deficiencies of the mother including personality, that caused the original removal, and deficiencies of the father; and it is ordered that each party shall receive counseling and therapy as deemed appropriate by the Department; and it is further ordered that the respondent mother and Shaun shall accept and participate in all services directed by the Department; and it is further ordered that the respondent mother and Shaun shall furnish the Department all requested authorizations for the Department to receive and release information from and too other persons and agencies involved in the case; and it is further ordered that all conditions of any prior orders not inconsistent shall continue; and it is further ordered that a review hearing shall be held by the court six months from the date of entry of this order for the purpose of reviewing progress reports and relevant developments, and in addition, the Broome County Department of Social Services shall provide to the court and all attorneys involved in the case and any party acting pro se progress reports prior to the hearing; and it is further ordered that the Law Guardian shall make regular inquiry into the matter and the welfare of the children Elizabeth, Christopher and Eric and provide timely written reports to the court with copies to all counsel and any party acting pro se.